

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              Plaintiff(s),

      v.

ANGELO CRUZ,

              Defendant(s).

**DECISION & ORDER and**
**REPORT & RECOMMENDATION**
10-CR-6096

## Preliminary Statement

On July 17, 2012, a federal grand jury returned a Second Superceding Indictment against defendant Angelo Cruz, therein charging him with narcotics conspiracy and murder while engaged in a drug crime.  See Second Superceding Indictment (Docket # 268). By text Order of Judge Charles J. Siragusa dated July 8, 2010, all pre-trial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).   (Docket # 17).   Currently pending before the Court are defendant Cruz's motions for a Bill of Particulars (Docket # 361), to suppress statements, and to suppress eyewitness identification (Docket ## 397, 399).  The Government has filed papers in opposition to Cruz's motions.   (Docket ## 446, 458).   On January 15, 2014, a suppression hearing was held and arguments were heard from the parties' attorneys.  Following the hearing, both parties filed supplemental briefs.  (Docket ## 637, 638).   The following is my Report and Recommendation as to the defendant's motions.

## Relevant Facts

Fred Vincent: In May of 1999 now retired Erie County Sheriff's Department Detective Fred Vincent became involved in the murder investigation of Francisco Santos after Santos's body was found on the Cattaraugus Indian Reservation.   See January 15, 2014 Suppression Hearing Transcript (hereinafter "1/15/14 Tr." or "Tr.") (Docket # 618) at pp. 3-5.  Vincent's partner in the investigation was lead detective John Pulatowski.  Tr. at 5.  Vincent testified that during the investigation he traveled to Rochester to interview witnesses and suspects with the assistance of the Rochester Police Department ("RPD").  Tr. at 5-6.  Based on information gleaned from these interviews, Vincent "identified the defendant [Cruz] as having been involved in criminal activity."  Tr. at 7-9.

At approximately 3:30 p.m. on June 16, 1999, Vincent met with Cruz in an interview room at the RPD.  Tr. at 15.  Cruz had been "picked up" by an RPD patrol officer earlier that day and brought down to police headquarters for questioning about the Santos murder.  Tr. at 15.  Vincent entered the room alone and introduced himself to Cruz, who was alone and seated un-handcuffed at a table. Tr. at 16, 22.  Vincent had never met Cruz before.  Tr. at 22. Vincent first asked Cruz his name and Cruz responded.  Tr. at 16, 22.  Vincent then explained to Cruz that he was investigating a homicide that took place in Erie County.  Tr. at 16.  At that point, Vincent advised Cruz of his Miranda rights using a laminated

waiver of rights card that Vincent "always carried" in his wallet. Tr. at 16.   Along with the laminated rights card, Vincent had a paper copy of the rights "card that was not encased in plastic and I wrote my initials on there and the time." Tr. at 25-26.   Vincent testified that the paper copy with his initials on it "went into our working file."   Tr. at 26.   Vincent read the four <u>Miranda</u> rights "verbatim" and then asked Cruz the two waiver questions, again reading   verbatim off of the card.   Tr. at 17-18.   With respect to the first waiver question – "do you understand each of these rights I have explained to you" – Vincent testified that after asking him this question Cruz "[d]id absolutely nothing." Tr. at 18.   Vincent then asked Cruz the second waiver question – "having these rights in mind do you wish to talk to us now" – and Cruz did not say or do anything in response.   Tr. at 18.   Vincent testified that Cruz "just looked at me" in response to the question.   Tr. at 19.   At that point, Vincent told Cruz that "if he would help me out I would tell the D.A.'s Office that he worked with me on the case, helping him out with the case."   Tr. at 19. Vincent told Cruz that "I would go to bat for him" with the District Attorney.   Tr. at 23.   Vincent testified that Cruz had "[n]o response" to this offer.   Tr. at 24.   Vincent testified that Cruz "was very cold" and Vincent "knew I was getting no place with him," so Vincent "left the room."   Tr. at 19.   Vincent was in the room with Cruz for a total of "[m]aybe ten minutes."   Tr. at 23.

Vincent testified that at no time did Cruz ask for an attorney or indicate that he did not want to speak with him.  Tr. at 19-20. Vincent did not physically or mentally abuse Cruz in any way, and Cruz did not appear to be in any type of physical discomfort.  Tr. at 20.  Cruz did not appear to be intoxicated and did not smell of alcohol.  Tr. at 20.

After leaving the room, Vincent went back into the RPD Detective Bureau and spoke with Investigator Galetta.  Tr. at 20. Vincent told Galetta that Cruz was very cold to him, he "was getting no place with him," and he "felt that it was a dead-end." Tr. at 20.  Investigator Galetta told Vincent that he "was going to talk to" Cruz and, at that point, Vincent "let [Galetta] handle things."  Tr. at 21.  Vincent did not see or speak to Cruz again. Tr. at 22-23.  Vincent prepared a police report regarding the time he spent in Rochester that week with respect to the investigation, including his meeting with Cruz, and submitted it to the Erie County Sheriff's Office.  Tr. at 26-27.

Glenn Weather: RPD Investigator Glenn Weather testified that in June of 1999 he was an investigator in the Homicide Unit of the RPD.  Tr. at 31.  On June 16, 1999, Weather became aware that some detectives from Erie County were in the RPD office investigating a case they had been working on, and Weather was asked to assist with the investigation.  Tr. at 32.  According to Weather, sometime that evening he was asked to assist in an interview of defendant Cruz.

4

Tr. at 46.   Weather testified that he did not "know to what extent [Cruz] had been interviewed" and "had no idea what questions were asked to him previously," but would not have tried to interview Cruz if he knew "that the defendant had already given a full statement and had cooperated fully."   Tr. at 46, 52.   Weather testified that he was not aware of whether Cruz had previously made "any type of statements" but it was "common place" during homicide investigations to "switch investigators" during an interview with a defendant or witness because sometimes the "person being questioned will get a bad feeling about someone or, you know, clam up, not talk to them or maybe just not like the way they look.   So we do [switch]."   Tr. at 51-52.   Before entering the interview room, Weather testified that he had been made aware that someone had already spoken with Cruz and that Cruz had been "read his Miranda rights and waived same."   Tr. at 33, 46.   Weather did not re-advise Cruz of his Miranda rights "[b]ecause I learned that they had already been advised" and that he "had waived them as well."   Tr. at 33.

Weather entered the interview room alone shortly after 6:00 p.m. and introduced himself to Cruz.   Tr. at 32-33, 42.   Weather testified that Cruz was not handcuffed when he entered the room. According to Weather, Cruz appeared to be "normal," and "didn't appear to be intoxicated or under the influence of drugs."   Tr. at 33.   Weather testified that Cruz "appeared to understand what I was

5

saying to him and respond accordingly." Tr. at 33. Weather testified that Cruz "was actually rather lucid. It didn't take too much to get him to have a conversation." Tr. at 47. Weather did not use "any tactics at all really" to get Cruz to speak with him. Tr. at 47-48. Weather testified that "[i]t was just a general conversation with him." Tr. at 48. Weather did not sense that Cruz was in any type of physical distress or pain. Tr. at 33. Weather testified that Cruz began speaking to him "right off the bat" and "almost immediately" Tr. at 53.

Weather testified that he spoke to Cruz alone "for about 20 minutes or so," then was joined by Investigator Pulatowski "for about ten minutes after that," then Weather spoke with Cruz "by myself" for about another 20 minutes, and then at approximately 7:00 p.m. he was joined by Investigator Baez and the two of them continued to interview Cruz for about 25 more minutes. Tr. at 34, 42-43. Weather testified that when Investigator Pulatowski initially entered the interview room Pulatowski told Cruz that Weather "was a good guy, he could trust me," and Cruz then "spoke a little bit more." Tr. at 47. At approximately 7:25 p.m., Weather left the room and Investigator Baez continued to interview Cruz alone for thirty minutes. Tr. at 43. From 7:55 p.m. to 8:00 p.m., Cruz was left alone in the interview room. Tr. at 43. At 8:00 p.m., Baez reentered the interview room alone and gave Cruz a soda and some food. Tr. at 43-44. Weather testified that he and

6

Baez resumed interviewing Cruz at 8:30 p.m. for another fifty minutes.  Tr. at 44.

Weather testified that after he was done interviewing Cruz, he and Investigator Baez brought Cruz from the interview room area to the Homicide Office "shortly before 10:00 p.m." to type up the information Cruz had given them during the interview.  Tr. at 34-35, 44.  Weather sat at his desk in the Homicide Office with Cruz seated next to him, and Weather "typed the document out as we spoke."  Tr. at 34-35.  Once Weather was done typing, he "read it aloud in its entirety from the screen," then printed it out and had Cruz read it aloud.  Tr. at 35.  Cruz then signed the document, and Weather and Baez "witnessed it with our signatures."  Tr. at 35. Weather testified that when he read the document out loud, he "also read the [Miranda] rights portion on the first page."  Tr. at 36. Weather asked Cruz if the statement "was correct," and Cruz "did make an addition to the statement, which was added and he initialed that."  Tr. at 36.  Weather testified that his meeting with Cruz lasted just under five hours total, from 6:10 p.m. to 11:05 p.m. Tr. at 37-38.

Weather testified that at no point during his meeting with Cruz did Cruz ever ask for an attorney or state that he no longer wanted to speak to them.  Tr. at 38.  At no point did Weather ever physically or mentally abuse Cruz during their meeting, nor did he or Baez ever scream at or threaten him.  Tr. at 38-39.  Weather

7

testified that Cruz did not appear to be intoxicated and his answers were responsive to the questions posed.   Tr. at 38-39. Weather testified that he and Cruz did not have any difficulty understanding each other.   Tr. at 39.   Weather testified that Baez never told him that Cruz had invoked his rights to remain silent or asked for an attorney.   Tr. at 51.

## Discussion

I.   Defendant's Motion to Suppress Statements:   Cruz seeks to suppress the statements he made to law enforcement on January 16, 1999, on the ground that he never waived his Miranda rights.[1] According to Cruz, his statement should be suppressed because he invoked his right to remain silent and never waived this right, yet the police continued to interrogate him.   Cruz argues that it was "incumbent upon" the police to "obtain a clear-cut statement" from Cruz that he was willing to waive his rights.   See Defendant's Post-Hearing Memorandum (Docket # 637) at p. 5.

---

[1] In his initial moving papers, Cruz argued that "he was never provided with any *Miranda* warnings."   See Defendant's Motion (Docket # 399) at p. 4.   In his post-hearing submission, Cruz abandons this argument, as he appears to concede that Miranda warnings were read to him, and focuses solely on the lack of evidence in the record to support any valid waiver of his right to remain silent.   See Tr. at 59.   The Court finds that even if defendant had pursued this argument, the evidence in the record shows that Cruz was read his Miranda rights.

8

It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his <u>Miranda</u> rights.  <u>United State v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004).  It is only in the context of a custodial interrogation that a defendant is entitled to be informed of his <u>Miranda</u> rights. <u>Dickerson v. United States</u>, 530 U.S. 428, 434-35 (2000).  Here, there is no dispute that the defendant was in custody at the time he made the statement at issue.  There is also no dispute that prior to making any inculpatory statement to law enforcement Cruz was given warnings consistent with the <u>Miranda</u> rule.  Thus, the admissibility of Cruz's admission hinges on whether he validly waived his right to remain silent.[2]  "The Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred."  <u>United States v. Murphy</u>, 703 F.3d 182, 192 (2d

---

[2] During the January 15th suppression hearing, defense counsel indicated that defendant may argue that he was intoxicated at the time he made his statement to the police, thereby precluding a valid waiver of his rights.  Defense counsel indicated a desire to "proceed[] by affidavit" with respect to whether defendant was intoxicated during the interview.  <u>See</u> 1/15/14 Tr. at 55.  The Court questioned the appropriateness of a defendant testifying by affidavit during a suppression hearing and not being subject to cross-examination, and the Government stated that it would not waive its right to "cross-examination of the witness."  <u>Id.</u> at 57. The Court ordered defense counsel to submit a memorandum of law on this issue.  Defendant, however, never filed a memorandum of law on this issue and his post-hearing submission does not address (i) whether he was intoxicated at the time he gave his statement to police, or (ii) whether he could properly proceed by affidavit with respect to whether he was intoxicated.  Accordingly, since the defendant did not pursue these arguments, the Court deems these arguments withdrawn.

9

Cir. 2012).

I find that the admissibility of the custodial statements made by Cruz on June 16, 1999 is controlled by the Supreme Court's decision in Berghuis v. Thompkins, 560 U.S. 370 (2010). In Berghuis, Thompkins was advised of his Miranda rights by police after being taken into custody on suspicion of committing a murder. Thompkins refused to sign the waiver of rights form. Nevertheless, police began a three hour interrogation in which Thompkins was "largely silent." Id. at 370. After "[a]bout 2 hours and 45 minutes" of interrogation, Thompkins made admissions about his involvement in the murder. Id. at 376. After being convicted at trial and exhausting his state court appeals, Thompkins's federal habeas petition was heard by the Supreme Court.

Of the issues addressed by the Supreme Court, one is particularly relevant to Cruz's claims here. Thompkins argued that after being advised of his Miranda rights, he thereafter invoked his right to remain silent "by not saying anything for a sufficient period of time," and, as a result, police should have ceased questioning him. Berghuis, 560 U.S. at 381. The Supreme Court rejected his arguments.

The Court began by noting that in the context of invoking the right to counsel protected by Miranda, it had already held in Davis v. United States, 512 U.S. 452, 459 (1994), that a suspect must do so "unambiguously." Berghuis, 560 U.S. at 381. "If an accused

10

makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." Id. (quoting Davis v. United States, 512 U.S. at 461-62)(internal citations omitted). Seeing no reason to create a different standard for invoking the right to remain silent as protected by Miranda, the Court established the same rule by requiring "an accused who wants to invoke his or her right to remain silent to do so unambiguously." Berghuis, 560 U.S. at 381. Because "Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police," he did not unambiguously invoke his right to remain silent. Id. at 382. "Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." Id. (internal quotation and citation omitted).

The Court next addressed whether Thompkins had waived his right to remain silent. In North Carolina v. Butler, 441 U.S. 369 (1979), the Court held that an implicit waiver of one's right to remain silent was sufficient to admit a suspect's inculpatory statement into evidence. "Butler made clear that a waiver of Miranda rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" Berghuis, 560 U.S. at 384 (quoting Butler,

11

441 U.S. at 373). Thus, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Berghuis, 560 U.S. at 385.

The Court determined that the record supported a finding that Thompkins waived his right to remain silent. First, there was no dispute that Thompkins was advised of his Miranda rights prior to police questioning. The rights were read aloud to Thompkins and "[t]here was more than enough evidence in the record to conclude that Thompkins understood" those rights. Berghuis, 560 U.S. at 385. Second, by eventually answering questions posed by the police, Thompkins engaged in conduct implying waiver. "If Thompkins wanted to remain silent, he could have said nothing in response to [the police]'s questions, or he could have unambiguously invoked his Miranda rights and ended the interrogation." Id. at 386. Third, Thompkins was never threatened or coerced in making a statement to police and a three hour interrogation is not "inherently coercive." Id. at 387. Finally, the Court held that its decision in Butler foreclosed any argument that the police were not allowed to question a suspect until after they had obtained a waiver. Under Butler, a waiver can be implied from the words and actions of the person being questioned. Butler, 441 U.S. at 373. "The Miranda rule and its requirements are met if

12

a suspect receives adequate <u>Miranda</u> warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." <u>Berghuis</u>, 560 U.S. at 387.

The holding of <u>Berghuis v. Thompkins</u> is dispositive to Cruz's arguments here.    First, the facts adduced at the suppression hearing demonstrate that Cruz was fully advised of his <u>Miranda</u> rights by Detective Vincent.    The rights were read by Vincent to Cruz verbatim off of a pre-printed advice of rights card that Vincent carried with him.    Second, there is sufficient evidence in the record to sustain a finding that Cruz understood those rights. Upon entering the interview room, Vincent asked Cruz his name and Cruz responded appropriately, thus confirming that Cruz spoke and understood English and was awake, alert, and mentally aware of Vincent's presence.    The fact that Cruz did not verbally respond to Vincent's waiver questions does not mean that Cruz did not understand his rights.    Significantly, as in <u>Berghuis</u>, Cruz does not contend that he did not understand the <u>Miranda</u> warnings read to him by Vincent, only that he did not waive his right to remain silent.    <u>See</u> Defendant's Post-Hearing Memorandum of Law (Docket # 637) at pp. 5, 7-8.    Indeed, Cruz's behavior and actions after being advised of his rights support a finding that he understood his right to remain silent.    Cruz listened to Vincent explain his rights and then turned "cold" and refused to even acknowledge Vincent's questions.    A short time later, Investigator Weather

entered the room and Cruz began to speak freely and intelligently to Weather, a "change of heart" that reflects cognition, understanding, and comprehension.

Third, there is no evidence that Vincent, Weather, or any law enforcement officer threatened, coerced, intimidated, forced, or deceived Cruz in an effort to make him speak to law enforcement. The suppression hearing testimony confirms that his decision to speak to Weather was a voluntary and deliberate choice. Fourth, Cruz's course of conduct on June 16, 1999 indicated an unambiguous waiver decision. As stated earlier, there is no claim here that Cruz did not understand his rights; "and from this it follows that he knew what he gave up when he spoke" to Investigator Weather. Berghuis, 560 U.S. at 385. Cruz certainly knew he had a choice whether to speak with law enforcement that afternoon – in fact, he decided not to speak with Detective Vincent for the few minutes they were together. During their brief interaction Vincent told Cruz that if he cooperated and "worked with me on the case," the prosecutor would be informed and it might help "him out with the case." Tr. at 19. The fact that Cruz later changed his mind and decided to freely speak with Investigator Weather (and sign a statement printed on a police form that set forth Miranda warnings) is consistent with an informed decision and therefore a knowing and voluntary waiver. As the Court in Berghuis explained:

> Interrogation provides the suspect with additional information that can put his or her decision to waive, or

14

not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that Miranda rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests. Cooperation with the police may result in more favorable treatment for the suspect; the apprehension of accomplices; the prevention of continuing injury and fear; beginning steps towards relief or solace for the victims; and the beginning of the suspect's own return to the law and the social order it seeks to protect.

560 U.S. at 388. In sum, Cruz's initial silence when advised of his rights was ambiguous conduct and, under Berghuis, police were not required at that point to terminate their questioning or specifically clarify whether Cruz was invoking his right to remain silent by being silent. Cruz's conduct thereafter unambiguously demonstrated that, upon reflection and with knowledge of his rights, he decided not to ask for a lawyer and to speak to Investigator Weather.

Based on the foregoing, and especially "the whole course of questioning" by law enforcement on June 16, 1999, I find that the Government has demonstrated by a preponderance of the evidence that Cruz received and understood the Miranda warnings, did not invoke his Miranda rights, and then waived his right to remain silent and gave a voluntary statement to Investigator Weather. Id. at 387-88. Accordingly, it is my Report and Recommendation that Cruz's motion to suppress the custodial statements made to law enforcement on June 16, 1999 be denied.

15

II. Motion for a Bill of Particulars: Defendant Cruz moves for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, therein asserting that the information is necessary to effectively defend the criminal charges contained in the Indictment. Defendant argues that the particulars he seeks are "necessary because the charges in the indictment are so general that they do not advise the defendant of the specific acts of which he is accused" and "[w]ithout such specification" he is unable "to prepare for trial and the danger of surprise at trial is greatly increased." See Affidavit of Herbert L. Greenman, Esq. annexed to Docket # 361 at ¶¶ 24-25. Defendant asserts that the Indictment here "is clearly 'bare bones' and provides virtually no details concerning approximately 11 years covered by the indictment." See id. at ¶ 31.

In response to defendant's motion, the Government argues that Cruz has "more than sufficient notice to prepare [his] defense and to avoid prejudicial surprise at trial," as the Government voluntarily provided defendant with discovery consisting of "over 7600 pages of documentary evidence, including investigative reports, search warrant applications with related affidavits, photographs, lab reports, criminal histories, statements of defendants, defendants' jail and medical records, medical examiners reports and photos of the defendants," as well as "audio recordings of body wire conversations." See Government's Memorandum in

16

Opposition (Docket # 446) at p. 3. The Government also "provided a long and detailed recitation of some of the proof against the defendants in this case," including defendant Cruz, during the detention hearing. Id. at p. 4.

The district court has broad discretion in deciding whether to grant a motion for a bill of particulars. See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). The critical issue is not whether the demanded particulars may be useful to the defense, but whether the charges against the defendant are so general that they fail to advise him of the specific acts of which he is accused. "[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004)(citation omitted); see United States v. Ahmad, No. 11-CR-6130L, 2012 WL 1944615, at *12 (W.D.N.Y. May 29, 2012)(In deciding whether a bill of particulars is needed, "the court may consider whether the information sought by the defendant has been made available through other means, such as discovery or prior court proceedings.")(collecting cases).

On this record, Cruz has not demonstrated that he lacks "sufficient information to prepare his defense and to avoid unfair surprise at trial, as well as to interpose a claim of double jeopardy, if necessary." Id. Throughout the lengthy period that this case has been pending, including many months when the matter

was being prosecuted as a capital case, the Government has provided voluminous and detailed discovery, including details obtained from cooperating witnesses who have described Cruz's alleged involvement in the Santos assault, abduction, and trip to the Indian Reservation in the Fall of 1998. Given the extent of the discovery disclosures already provided to the defense, and the fact that the Government has agreed to disclose all Jencks Act materials at least thirty days before jury selection, I find that a bill of particulars providing additional evidentiary details at this time is not justified. Accordingly, Cruz's demand for a Bill of Particulars is **denied**.

III. Motion to Suppress Eyewitness Identification: The defendant has moved to suppress the results of four identification procedures in which a photographic array was used by law enforcement. Two witnesses were shown the array on June 11, 1999 and two witnesses were shown the array on June 14, 1999. See Affidavit of Herbert L. Greenman, Esq. (Docket # 399) at ¶ 31. The Government response is simply that the defendant is not entitled to a hearing because Cruz has not "identif[ied] what about the array is suggestive." See Government's Memorandum in Opposition (Docket # 458) at p. 2.

Government counsel has informed the Court and defense counsel that even if Cruz identifies aspects of the array that are improperly suggestive, the witnesses who were shown the array were

18

not strangers but rather individuals who know Cruz and thus have a reliable independent basis to make an identification of Cruz at trial. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972); see also United States v. Shakur, Nos. SSS 82 Cr. 312-CSH, 84 Cr. 220-CSH, 1987 WL 5368, at *1 (S.D.N.Y. Jan. 9, 1987)(denying request for Wade hearing relating to photographic identifications by witnesses who had "extensive, personal contacts with [defendant] in both licit and illicit activities"). The Government suggested that the Court follow the procedure that has been used in prior cases and have the identity of the witnesses shown the array disclosed by the Government at the pretrial conference or two weeks before trial, whichever date is earlier. The defendant can then decide whether to challenge the "independent basis" of the witness to make an identification, and if necessary, the trial judge or this Court can convene a hearing on the suggestiveness of the array or the challenged independent basis, or both. Defense counsel did not object to the Government's proposal and this Court agrees it is an efficient way to avoid a fact-finding hearing that may very well not be necessary given the proffer of the Government. Accordingly, it is my Report and Recommendation that the defendant's motion to suppress the results of the four identification procedures conducted in June 1999 (Docket # 399) be **denied without prejudice** should the defendant decide to challenge the independent basis the witnesses may have to identify Cruz at trial.

19

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant Cruz's motions to suppress statements (Docket ## 397, 399) be **denied**, and to suppress eyewitness identification (Docket ## 397, 399) be **denied without prejudice to renew**. The defendant's motion for a Bill of Particulars (Docket # 361) is **denied**.

Finally, this Report and Recommendation resolves all remaining motion practice before this Court on all defendants named in the Second Superceding Indictment. Thus, unless directed by the District Judge to conduct further hearings or decide additional matters, all further proceedings in this case will be before Judge Geraci.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: February 27, 2015
       Rochester, New York

20

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[3]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.</u>

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

Jonathan W. Feldman
United States Magistrate Judge

Dated:      February 27, 2015
            Rochester, New York

---

[3] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).